**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| **FISHER BIOSERVICES, INC.,** | : | **CIVIL ACTION** | |
| **Plaintiffs** | : | | |
| | : | | |
| **vs.** | : | | |
| | : | | |
| **BILCARE, INC. AND ELIZABETH** | : | | |
| **J. HAAS,** | : | | |
| **Defendants.** | : | **No.** | **06-567** |

## Findings of Fact, Conclusions of Law and Decision of the Court

Gene E.K. Pratter, J.                                    **May 31, 2006**

Plaintiff, Fisher Bioservices, Incorporated ("Fisher"), has moved for a preliminary

injunction against defendants Bilcare, Incorporated ("Bilcare") and Elizabeth Haas in this case

which involves the alleged violation by Ms. Haas and facilitated by her new employer, Bilcare, of

an employment restrictive covenant agreement that Fisher contends was part of its contractual

arrangement with Ms. Haas.[1]

INTRODUCTION

Fisher commenced this case on February 7, 2006 by filing a complaint against Bilcare,

Limited and Elizabeth J. Haas.[2]  Ms. Haas, who formally began working for Bilcare on January

16, 2006, is a former employee of Fisher Bioservices, which is a wholly owned subsidiary of

---

[1]  Fisher initially moved for a temporary restraining order prior to pursuit of a preliminary
injunction.  However, following a telephone conference with counsel on February 28, 2006, the
Court was advised that Fisher agreed to forego a temporary restraining order, but, instead,
requested a hearing with respect to its motion for a preliminary injunction.

[2]  The parties subsequently stipulated that Bilcare, Limited had been named mistakenly
and that the proper entity to the suit is Bilcare, Incorporated.  The parties stipulated to the
dismissal of Bilcare, Ltd. and agreed to substitute Bilcare, Incorporated as a party.

Fisher Clinical Services, Inc.  Prior to working at Bilcare, Ms. Haas worked for Fisher

Bioservices as a sales person, a position that she had held since April 20, 2000.

On February 24, 2006, Fisher moved for a preliminary injunction against Ms. Haas and

Bilcare to prevent their continuing to engage in the alleged wrongful conduct described above.

A hearing on Fisher's motion was held on  April 10, 19 and 21, 2006.[3]  During the course of the

hearing, testimony was received from the following witnesses: (1) Jeri Sue Marsh, a human

resources manager for Fisher Bioservices; (2) Brian Jeffrey Hallquist, Director of Sales for Fisher

Bioservices; (3) Donald L. Nolde, Director of Strategy and Business Development for Fisher

Bioservices; (4) Mark C. O'Donnell, Vice President of Sales and Marketing for Bilcare, and (5)

Elizabeth J. Haas, Director of Client Services at Bilcare.

The Court's Findings of Fact and Conclusions of Law follow.

**FINDINGS OF FACT**

**Parties Involved**

1.      Fisher provides clinical services to customers conducting clinical trials of new

pharmaceutical products.  J. Hallquist, Mar. 27, 2006 at 40:12-17; 57:2-7; J. Hallquist, Apr. 10,

2006 at 38:20-24.  The term "clinical services" includes "packaging, labeling, storage,

distribution and analytical chemistry services for [the] support of drug development."  Fisher also

provides "biological services," which includes the "collection of blood and tissue samples during

clinical trials to measure the result of . . . the investigational drug in a patient."  J. Hallquist, Mar.

---

[3]  The hearing held on March 27, 2006 did not address the substance of the preliminary
injunction motion, but rather dealt with a motion to dismiss the action on jurisdictional grounds
filed by Bilcare.  To the extent that testimony provided at that hearing is relevant to this motion,
the March 27, 2006 hearing will be referenced.

27, 2006 at 57:9-11.

2.      Prior to August 1, 2005, when its stock was purchased by Fisher Clinical Services Inc. ("FCS") ("Fisher Acquisition"), Fisher was known as "McKesson Bioservices Corporation" ("McKesson").  J. Hallquist, Mar. 27, 2006 at 43:17-21; Affidavit of J. Jochims, Assistant General Counsel of Fisher Scientific Int'l at ¶ 5.[4]  The present "Fisher BioServices," i.e., the company for which Ms. Haas worked, is now a wholly owned subsidiary of Fisher Clinical Services, Inc.  Affidavit of J. Jochims at ¶ 6.

3.      Fisher has three divisions: a Pharmaceutical Services Division, a Biological Services Division, and a Government Services Division.  D. Nolde, Apr. 10, 2006 at 45:14-20. The "clinical services" at issue in this case, which include packaging, labeling, storage, distribution, and chemical analyses, are provided by the Pharmaceutical Services Division ("PSD").  D. Nolde, Apr. 10, 2006 at 46:20 to 47:4.

4.      Prior to its purchase by Bilcare, Ltd., in July of 2005, the corporate defendant in this case, Bilcare was known as "ProClinical."  M. O'Donnell, Apr. 21, 2006 at 5:20-22.

5.      Bilcare has "two primary portfolios" as a company doing business in the pharmaceutical industry.  First, it provides "clinical services" to its clients conducting clinical trials of its product.  Second, it provides packaging services ("films and foils") for those pharmaceutical products. M. O'Donnell, Apr. 21, 2005 at 4:22-25; 5:1-16.

6.      The individual defendant in this case, Ms. Haas, is currently employed by Bilcare.  E. Haas, Mar. 27, 2006 at 62:14-15.  Prior to going to work formally for Bilcare, Ms.

---

[4]  Mr. Jochims submitted his affidavit in support of Fisher's opposition to Bilcare's Motion to Dismiss for Lack of Subject Matter Jurisdiction. The document is electronically available from the docket of this case as Document No. 13, Attachment 1.

Haas worked for Fisher from April 27, 2000 (when it was still known as McKesson) until January 13, 2006 (by which time it was known by the Fisher name).  E. Haas, Mar. 27, 2006 at 62:16 to 63:6; S. Marsh, Apr. 10, 2006 at128:16.  Prior to going to work for Fisher (specifically, its McKesson predecessor) in April 2000, Ms. Haas worked for ProClinical.  J. Hallquist, Apr. 10, 2006 at 15:16-23; E. Haas, Apr. 19, 2006 at 143:24 to 144:3.

7.      During most of the time she was employed by Fisher, Ms. Haas was a salesperson. E. Haas, Apr. 19, 2006 at 144:11-17.  While at McKesson (including after McKesson became known as Fisher), Ms. Haas was responsible for sales in southern California, New England, Pennsylvania, part of New Jersey and eastern Canada, as well as Texas.  E. Haas, Apr. 19, 2006 at 101:7-9, 18; cf. D. Nolde, Apr. 10, 2006 at 72:1-6. Immediately prior to the Fisher Acquisition, Ms. Haas's title was Regional Sales Manager and she reported to Donald Nolde, who was Director of Sales for Fisher (while it was still known as "McKesson").  E. Haas, Mar. 27, 2006 at 63:9-10; D. Nolde, Apr. 10, 2006 at 51:10-15; 44:17-20; E. Haas, Apr. 19, 2006 at 101:4-6.

8.       Some time after the Fisher Acquisition, by early November 2005, Ms. Haas's title was changed to Account Executive and she reported directly to Jeffrey Hallquist, Fisher Clinical Service's Director of Sales.  J. Hallquist, Mar. 27, 2006 at 38:23-24; 39:19-21; 63:10-12; J. Hallquist, Apr. 10, 2006 at 17:12-18.

9.      For a period of approximately six months, sometime in 2001 or 2002, Ms. Haas was in charge of Fisher's packaging and labeling operations.  E. Haas, Apr. 19, 2006 at 144:15-20; E. Haas, Apr. 19, 2006 at 153:14 - 154:7.

**Employee Agreement with Fisher** – **Circumstances and Terms**

10.     On April 10, 2000, Ms. Haas received an offer letter of employment from Brenda L. Haywood who, at that time, was the Director of Human Resources at McKesson.  Plaintiff's Ex. 40.  The offer of employment was valid through 5:00 p.m. on Monday, April 17, 2000.  Id. While the offer letter contained information about the salary that Ms. Haas would be paid and her position title, it did not set forth information about employee benefits.  Id.  Ms. Haas acknowledged the offer letter on April 13, 2000 with her signature.  Id at 2.

11.     The offer letter also specified that the offer of employment was contingent upon completion of (1) a pre-employment background check; (2) drug testing requirements; and (3) satisfactory proof of eligibility for employment in the United States.  Id. at  1.  The offer letter made reference to an enclosure describing the types of documents acceptable to establish identity and employment eligibility, as well as a "custody and control form" to be used to facilitate the drug testing procedure.  Id.  The offer letter did not make reference to any other document, including a document titled "Employee's Agreement Respecting Confidential Information, Competition and Trade Secrets" (the "Agreement"), and it did not state that the offer of employment was contingent upon the offeree executing an employment/confidentiality agreement.

12.     Although it was not expressly mentioned in the letter, Fisher contends that at that time, it was the practice of the Human Resources Department to include the Agreement with offers of employment.  S. Marsh, Apr. 10, 2006 at 119:19-25; 121:14-16.  The circumstances surrounding the presentation and execution of such an agreement is the core of the dispute here.

13.     At the time that Ms. Haas was hired by McKesson, all sales employees

were required to sign a restrictive agreement that contained the same terms as the Agreement.  S. Marsh, Apr. 10, 2006 at 119:5-8; D. Nolde, Apr. 10, 2006 at 52:20-23.  No employee was permitted to work in sales at McKesson unless they did so.  S. Marsh, Apr. 10, 2006 at 115:23-24; 117:14-17; D. Nolde, Apr. 10, 2006 at 53:2-4; 103:23 – 104:11.

14.     On April 27, 2000, the first day of her actual employment with McKesson, Ms. Haas completed[5] and signed such an Agreement.  Plaintiff's Ex. 2.  The preface to the terms of the Agreement state that the employee, "as part of the consideration for McKesson BioServices employing me, paying me a salary, and providing me with other benefits, I agree as follows. . . ."

15.     Ms. Haas admits that although no one prevented her from doing so, she chose not to read the Agreement before signing it.  E. Haas, Apr. 19, 2006 at 157:9-22.  At the time Ms. Haas signed the Agreement, it was her first day of work at McKesson, and she knew she had not yet been placed on the company payroll.  E. Haas, Apr. 19, 2006 at 158:11-13.

16.     There are five specific provisions of the Agreement that are relevant here.  The first is the definition of "Company Information" in the Agreement's first paragraph, which states:

> [T]he Company's research and development plans or projects, data and reports; computer materials such as programs, instructions and printouts; formulas; product testing information; business improvements, processes, marketing and selling; strategic business plans (whether pursued or not); budgets; unpublished financial statements; licenses; pricing, pricing strategy and cost data; information regarding the skills and compensation of other employees of the Company; the identities of the Company's clients, customers and potential customers (hereinafter referred to collectively as "Customers"); the identities of contact persons at those Customers; the particular preferences, likes, dislikes and needs of those Customers and contact persons with respect to products, pricing, sales calls,

---

[5]   The Agreement includes a blank space just under the highlighted subtitle "Respecting Confidential Information, Competition and Trade Secrets," in which the employee's name was to be inserted.  Ms. Haas testified that she herself printed her own name on the Agreement before signing it.  E. Haas, Apr. 19, 2006 at 156:19-25.

> timing, sales terms, service plans, methods, practices, strategies, forecasts know-how, and other marketing techniques; the identities of key accounts, potential key accounts, Customers successfully cultivated or maintained by me during my employment at the Company; the identities of the Company's suppliers and contractors, and all information about those supplier and contractor relationships such as contact person(s), pricing and other terms.

Agreement at ¶ 1.

17.    The second provision of the Agreement that is relevant to this dispute is the

specific undertaking by which the employee agrees that he or she:

> will not, during or after my employment with [Fisher] or any of its subsidiaries (collectively, the "Company"), (i) directly or indirectly disclose to any person or entity, or use, except for the sole benefit of the Company, any of the Company's confidential or propriety information or trade secrets (collectively, "Company Information") obtained by me in the course of my employment.

Id.

18.    The third provision of the Agreement that is relevant to this dispute is Paragraph

2, designated "Return of Company Documents" which provides, in relevant part:

> When I leave the employ of the Company, I will deliver to the Company (and will not keep in my possession, copy, recreate or deliver to anyone else) any and all Company information devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, together with all copies thereof (in whatever medium recorded) belonging to the Company, its subsidiaries, successors or assigns.

Id at ¶ 2.

19.    The fourth relevant provision of the Agreement is found in Paragraph 3:

> [D]uring the period of my employment by the Company I will not, without the Company's express written consent, engage in any other employment or business activity directly related to the business in which the Company is now involved or becomes involved, nor will I engage in any other activities which conflict with my obligations to the Company.  For the period of my employment by the Company and for one (1) year after the date of termination of my employment by the Company I

will not (i) accept any employment position which would require use or disclosure of Company information or knowledge obtained by me during the course of my employment by the Company, (ii) directly or indirectly solicit, encourage or induce any employee of the Company to leave the employ of the Company, or (iii) solicit the business of any customers of the Company (other than on behalf of the Company).

_Id_. at ¶ 3.[6]

20.    The fifth provision that is germane here is in Paragraph 8:

Because my services are personal and unique and because I may have access to and become acquainted with the proprietary information of the Company, the Company shall have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond, and without prejudice to any other rights and remedies (including recovery of monetary damages) that the Company may have for a breach of this Agreement. The Company shall be entitled to reasonable attorneys' fees incurred in the enforcement of this Agreement.

Id. at ¶ 8.

21.    In addition to these five provisions, the Agreement also states that "[t]he provisions of this Agreement shall survive the . . . assignment of this Agreement by the Company to any successor in interest or other assignee." Agreement at ¶ 12.[7]

---

[6] In its Reply Memorandum of Law in Support of Motion for Preliminary Injunction, Fisher indicated that it does not seek, in the context of its Motion for Preliminary Injunction, to enforce the provision in Paragraph 3(i), _viz._, the agreement not to "accept any employment position which would require use or disclosure of Company information or knowledge obtained by me during the course of my employment by the Company."

[7] This provision is relevant because, under Pennsylvania law, restrictive employment covenants are not assignable to successor employers except as explicitly permitted by the agreement unless the employee consents to the assignment. Siemens Medical Solutions Health Services Corp. v. Carmelengo, 167 F. Supp. 2d 752, 757-58 (E.D. Pa. 2001). Although not formally argued in this motion, the Court notes that because the Agreement contained an explicit provision allowing for its assignment, Fisher may, to the extent that it is enforceable, validly enforce the Agreement.

22.     The enforceability of the Agreement is disputed.  While Fisher argues that the Agreement imposes valid and reasonable employment restrictions, Ms. Haas contends that she "does not recall" signing the Agreement and never intended to enter into a non-compete agreement with McKesson.  E. Haas, Mar. 27, 2006 at 66:19-20.  Although Ms. Haas concedes that she both printed and signed her name on the Agreement and that the signature on the Agreement is indeed hers, she claims that she was never made aware of the terms of the Agreement and did not know that any such agreement was in place until after the present lawsuit was filed.  E. Haas, Mar. 27, 2006 at 67:23-24; E. Haas, Apr. 19, 2006 at 44:1-25; 45:1-25; 156:19-25; 157:1-11.  As noted above, Ms. Haas admitted that she did not read the document before or after signing it.

### Conduct Regarding Fisher Company Information

23.     One of the issues in this case is whether Ms. Haas, both when she was a Fisher employee and since she has gone to work for Bilcare, breached the Agreement or otherwise violated Fisher's legal rights with regard to the maintenance of the confidentiality of its proprietary "Company Information" as defined in the Agreement.

24.     There are several aspects of Ms. Haas's conduct which, Fisher contends, give rise to a breach of the Agreement.  First, Fisher contends that business information recorded by Ms. Haas in paper notebook calendars, "scribble books,"[8] and her contacts maintained electronically on Microsoft Outlook® all constitute Company Information that is, under the terms of the Agreement, owned by Fisher and she removed these items when she left Fisher and joined its

---

[8]  In the context of this case, a "scribble book" is a notebook in which Ms. Haas kept with her at all times for the purpose of recording both personal and business information.  E. Haas, Apr. 19, 2006 at 31:9-19.

competitor, Bilcare.  Next, Fisher contends that a series of conversations that Ms. Haas had with

Mr. O'Donnell in negotiating her employment with Bilcare while she was still a Fisher employee

constituted violations of her duties to Fisher.  Finally, Fisher asserts that Ms. Haas's use of

Fisher's Company Information, including that information found in her calendars, scribble books

and electronic mail contacts, constitutes an ongoing breach of Ms. Haas's Agreement with

Fisher.  The facts found by the Court surrounding these assertions follow.

**Contact Information**

25.     While she was employed by Fisher, and since she has worked for Bilcare, Ms.

Haas kept a handwritten hard copy calendar.  E. Haas, Apr. 19, 2006 at 26:23 to 27:11.

26.     In these calendars, Ms. Haas kept information related to her personal and

business appointments.  E. Haas, Apr. 19, 2006 at 115:15-20.  With respect to business contacts,

this information typically included, at a minimum, the name of the customer company, the name

of the person at the company whom she was meeting with, the person's telephone number and

sometimes directions to the meeting.  E. Haas, Apr. 19, 2006 at 116:12-21.

27.     In addition to the calendars, Ms. Haas maintained business information in

handwritten notebooks, journals that she had with her at all times and which she called "scribble

books."  E. Haas, Apr. 19, 2006 at 31:9-19.  Ms. Haas used these journals to record business as

well as personal information, including the contact information of people she met at trade shows,

meetings, and training sessions.  E. Haas, Apr. 19, 2006 at 31:20 to 32:2; 118:7-10; 109:7-18.

28.     Although Ms. Haas maintained that none of the information in her scribble books

was of any value to her at Bilcare because it was all "study specific", she conceded that some of

the entries might not, in fact, be "exclusively study-specific."  E. Haas, Apr. 19, 2006 at  122:13-

18;163:9-17.  For example, one of the entries in Ms. Haas's scribble book sets forth notes with respect to what a customer wanted to see when conducting an audit of Fisher's facilities, and another entry contains notes with respect to why a client was reportedly dissatisfied with Fisher. E. Haas, Apr. 19, 2006 at 118:12-14; 119:22-25; 120:1-2.

29.     Although her supervisors were aware that Ms. Haas maintained calendars and scribble books, after Ms. Haas resigned from Fisher she was not asked to return these items to Fisher. E. Haas, Apr. 19, 2006 at 124:9-17.

30.     In addition to the calendars and scribble books, Ms. Haas also maintained an electronic list of business contacts on a computer disk.  E. Haas, Apr. 19, 2006 at 34:6-10; see also Plaintiff's Ex. 4.  Ms. Haas made a copy of these contacts and installed it on her personal computer at Bilcare for her use.  E. Haas, Mar. 27, 2006 at 70:1;  E. Haas, Apr. 19, 2006 at 34:11-13.

31.     According to Ms. Haas, of the roughly 700 different contact names contained on the disk,  approximately 500 represented "business relationships that [she] originated" when she was at Fisher.  E. Haas, Apr. 19, 2006 at 108:1-10, 22-25; 112:20-25.

32.     Much of the information in Ms. Haas's computerized contacts data, some of which was entered by Ms. Haas's assistant at Fisher, related to people Ms. Haas had met at one time or another, either at trade shows, meetings, training sessions, or other business development opportunities that she was paid to attend as an employee of Fisher. E. Haas, Apr. 19, 2006 at 109:4-12; 141:24 to 142:12; 134:3-11; 161:4-14.  Many of these individuals either were clients or prospective clients of Fisher.  E. Haas, Apr. 19, 2006 at 110:13-16.

33.     Any information contained in Ms. Haas's contact list that would have been beneficial to McKesson or, in turn, Fisher, was transferred from her contact information to her employer's

marketing database, either "Sales Link" (before the Fisher Acquisition) or "Goldmine" (after the Fisher Acquisition).  E. Haas, Apr. 19, 2006 at 111:6-14.

34.     Several of the contacts listed in Ms. Haas's database reflect specific, sometimes personal, information about that contact which would be uniquely important to any other salesperson, when dealing with that contact.[9]

**Discussions with Bilcare and Resignation from Fisher**

35.     Ms. Haas first met with representatives of Bilcare in a "fact-finding" meeting that took place in the summer of 2005 — when Bilcare was contemplating the purchase of ProClinical. E. Haas, Apr. 19, 2006 at 4:7-15. Ms. Haas was still employed by Fisher when she attended this meeting, and did not inform her supervisor at Fisher about the meeting.  E. Haas, Apr. 19, 2006 at 5:22-25.

36.     At this meeting, Ms. Haas shared with Bilcare representatives her "thoughts" regarding the industry and, later, provided recruiting recommendations, including recommendations regarding who would make a good president for Bilcare's new organization.  E. Haas, Apr. 19, 2006 at 5:9-17; M. O'Donnell, Apr. 21, 2006 at 75:18 – 76:1.  The possibility that Ms. Haas might herself accept a position with Bilcare was also discussed "in a very vague way" at this meeting.  E. Haas, Apr. 19, 2006 at 5:18-21; M. O'Donnell, Apr. 21, 2006 at 76:2-4.

37.     A few months after Fisher acquired McKesson, Ms. Haas communicated to Mr. Nolde her sense that she was not going to be a "good fit" in the new Fisher organization.  D. Nolde,

---

[9] As examples, one contact was noted to be "working w/Fisher; not happy w/ last experience," another entry briefly described the business line for the client, and a third noted that the individual has two daughters, with one attending the University of Pennsylvania, and that the client had given up owning a Ferrari to start his company.  See Plaintiff's Ex. 4 at 53D0171; 53D0183; 53D0199.

Apr. 10, 2006 at 53:20-22.  By mid-October 2005, Ms. Haas decided to explore other employment

options, and again met with individuals at Bilcare, this time to discuss specifically the possibility of

her working there.  E. Haas, Apr. 19, 2006 at 6:1-6.

38.     In a phone conversation on October 19, Mr. O'Donnell offered Ms. Haas a position

with Bilcare as a senior account executive.  M. O'Donnell, Apr. 21, 2006 at 78:2-6.  The next day,

on October 20, 2005, Mr. O'Donnell sent Ms. Haas a letter extending her a written offer to work as

a senior account executive at Bilcare. Plaintiff's Ex. 5.  The anticipated start date reflected in the

letter was January 16, 2006.  Id.

39.     That same day, October 20, 2005, Ms. Haas endeavored, via electronic mail, to

send a one-page email, with two attachments, from her Fisher email to a personal internet-based

electronic mail account.  E. Haas, Apr. 19, 2006 at 38:19-25; 39:19-25; 40:1-25.  The two

attachments, introduced into evidence as Plaintiff's Exhibits 7-A and 7-B, consisted of spreadsheets

containing the names and addresses from Ms. Haas's contact list.  J. Hallquist, Apr. 19, 2006 at 14:5-

7; E. Haas, Apr. 19, 2006 at 105:16-25; 106:1-3.  Ms. Haas acknowledged that she did attempt to

send the list, but contends that she was unsuccessful in this attempt.  E. Haas, Apr. 19, 2006 at 41:1-

15.

40.     After he sent the letter of October 20, 2005, Mr. O'Donnell had several more phone

conversations with Ms. Haas in order to ascertain whether she was taking the Bilcare job.  M.

O'Donnell, Apr. 21, 2006 at 79:17-19; 80:17-21.   On December 23, 2005 Mr. O'Donnell learned

from Ms. Haas that she was considering tendering Fisher her resignation.  M. O'Donnell, Apr. 21,

2006 at 81:6-11.  Sometime during the week between Christmas and New Year, Ms. Haas called Mr.

O'Donnell to tell him that she was going to resign from Fisher at the end of the year.  M. O'Donnell,

Apr. 21, 2006 at 81:19-24.

41.     Ms. Haas testified that she waited until December 31 to resign from Fisher so as to

avoid the risk of losing a sales bonus of approximately $30,000 - $40,000 to which she was entitled.

E. Haas, Apr. 19, 2006 at 9:4-12.

42.     On December 31, 2005, Ms. Haas sent an email to, among others, Messrs. Hallquist

and Nolde, in which she stated that she had "decided to resign from Fisher and to leave sales as

well." Plaintiff's Exhibit 14.

43.     During the first week of January, 2006, via a telephone conversation, Mr. O'Donnell

and Ms. Haas set Ms. Haas's start date at Bilcare. M. O'Donnell, Apr. 21, 2006 at 82:5-9.

44.     Ms. Haas had her exit interview with Ms. Marsh on Friday, January 13, 2006.

S. Marsh, Apr. 10, 2006 at 128:15-16.  In the course of this interview, Ms. Marsh asked Ms. Haas

whether she had another job or had received any offers.  According to Ms. Marsh, Ms. Haas replied

that "she did not have another job, was exploring some opportunities, but didn't have anything firm."

S. Marsh, Apr. 10, 2006 at 128:6-14.

45.     Ms. Haas formally signed the October 20, 2005 Bilcare offer letter on January 16,

2006, and began her employment with Bilcare on that day. Plaintiff's Ex. 5; E. Haas, Apr. 19, 2006

at 93:3-7.

**Use of Fisher Information at Bilcare**

46.     One of the factual disputes between the parties concerns the extent to which Ms.

Haas is acting in a sales role at Bilcare, and therefore having direct or indirect contact with customer

clients who may be Fisher clients, in violation of the Agreement's prohibition in Paragraph 3(iii) of

her solicitation of business from Fisher customers for one year after leaving Fisher's employ.

14

47.    Ms. Haas's present job title at Bilcare is "Director of Client Services." E. Haas, Apr. 19, 2006 at 14:3-4. Ms. Haas's position with Bilcare was described by Mark O'Donnell, her supervisor, as "a senior sales representative, not necessarily with in-line management responsibilities." Exhibit P-19 (electronic mail message from Mark O'Donnell to certain Bilcare employees). Mr. O'Donnell describes Ms. Haas's job responsibilities as "in addition to sales . . . mentoring, serving as an in-house contact for field-based reps . . . and, most importantly . . . a 'crisis management' contact when needed in dealing with customers." Id.

48.    Ms. Haas says that she perceives her obligations at Bilcare not to include the responsibility of obtaining sales leads, but rather to act as a liaison between sales representatives and clients. E. Haas, Apr. 19, 2006 at 16:16-18. Although Ms. Haas's role is not limited to sales, sales is a component of her position at Bilcare. E. Haas, Apr. 19, 2006 at 93:18-19; 15:3 – 16:13; M. O'Donnell, Apr. 21, 2006 at 15:25 to 16:7; Plaintiff's Ex. 19 (describing Ms. Haas's role at Bilcare as a "senior sales representative, not necessarily with in-line management responsibilities").

49.    On January 16, 2006, Ms. Haas's first day working at Bilcare, she received an electronic mail message from her supervisor, Mark O'Donnell, welcoming her to Bilcare and setting forth "a top line of priorities." Plaintiff's Exhibit 55. The first priority listed was to identify new business, especially anything that could be booked quickly over the next few months. Id. Mr. O'Donnell also asked Ms. Haas to create a customer database of key targets and contacts. Id.

50.    The day after she began working at Bilcare, Ms. Haas contacted several of her professional contacts, many of whom were customers of Fisher, to advise them of her new position and, in some cases, to solicit business from them, including:

a.    A message to Terry Barnes, a manager of clinical supplies at PPD

Developments.  Ms. Barnes was listed as a "client" in Ms. Haas's contact list. Plaintiff's Ex. 4.  In the message, Ms. Haas provided her new contact information, noting that "nothing changed," and then gave Ms. Barnes her new work telephone number.  Ms. Haas then asked Ms. Barnes who she would like to meet from Bilcare and "what kinds of stuff can we put in place to attract your business?", adding "[t]he project managers they [Bilcare] hired are extremely experienced."  Plaintiff's Ex. 60.

b.   A message to Bernadette D. M. Cunningham, the associate director of clinical trial supplies at OSI Pharmaceuticals.  Ms. Cunningham was listed as a client in Ms. Haas's contact list.  Plaintiff's Ex. 4.  In this message, Ms. Haas provided her new contact information, explaining that "Bilcare is a clinical supply vendor (was ProClinical)," and stated that "[i]f you have a project Fisher can't meet the timeline on I'd love to offer our help."  Plaintiff's Ex. 50.

51.   Ms. Haas has also communicated with several Fisher clients, either by contacting them or through their contacting her, after arriving at Bilcare.  E. Haas, Apr. 19, 2006 at 161-163. These customers included OSI, ISTA, Millennium, Amylin, PPD and Praecis.  E. Haas, Apr. 19, 2006 at 161:224-25; 162:1-25; 163:1-7.  Of these companies, PPD and Amylin had also previously been customers of Bilcare.  E. Haas, Apr. 19, 2006 at 163:6-7.

52.   Ms. Haas did, based on her experience and relying on her prior contacts, bring new business to Bilcare.  In a February 1, 2006 message from Mr. O'Donnell to another Bilcare employee, Mr. O'Donnell stated that Ms. Haas "brought in the Amylin client," and went on to note

that "[w]e have about 20 client meetings scheduled over the next month, mostly clients that Joa [Ms. Haas] and May[10] know from their experience." <u>Plaintiff's Ex. 56</u>. In the same message, Mr. O'Donnell also requested that he or Ms. Haas review sales quotes before they are sent out, noting that since Ms. Haas was bringing customers in, she should be able to review what was being sent "before it goes out directly to [her] contacts." <u>Id</u>.

53.     Also on February 3, 2006, Ms. Haas received an electronic mail message from Patrick McKenna, the manager of packing and supply operations at Praecis Pharmaceuticals Incorporated, in which Mr. McKenna requested a preliminary quotation for some work. <u>Plaintiff's Ex. 61</u>.

## Conclusions of Law

54.     Rule 65 of the Federal Rules of Civil Procedure authorizes the Court to issue temporary restraining orders and preliminary injunctions. In deciding whether to grant the injunctive relief that Fisher seeks, the Court must consider whether (1) Fisher has demonstrated the likelihood of its success on the merits; (2) Fisher will be irreparably harmed by the denial of injunctive relief; (3) the balance of the harms favors Fisher or if, instead, granting the relief would result in even greater harm to Ms. Haas and/or Bilcare; and (4) the public interest favors granting the injunction. <u>Kos Pharms., Inc. v. Andrx Corp.</u>, 369 F.3d 700, 708 (3rd Cir. 2004); <u>ACLU of New Jersey v. Black Horse Pike Reg. Bd. of Ed.</u>, 84 F.3d 1471, 1477 (3rd Cir. 1996); <u>see</u> <u>also</u> <u>Siemens Med. Solutions Health Servs. Group v. Carnelengo</u>, 167 F. Supp. 2d 752, 757 (E.D. Pa. 2001) (applying same standards in non-compete case).

---

[10]  May Wattie Singh was Ms. Haas's assistant at Fisher, who has also joined Bilcare at about the same time as did Ms. Haas. <u>E. Haas, Apr. 19, 2006</u> at 59:13-17; 112:4.

55.     In order to determine whether Fisher is likely to succeed on the merits of

its complaint, the Court must first determine whether the Agreement is enforceable.

56.     Under Pennsylvania law,[11] restrictive covenants are disfavored but are enforceable

if: (1) they are ancillary to an employment relationship between the parties; (2) if they are supported

by adequate consideration; (3) the restrictions imposed by the covenant are reasonably necessary for

the protection of legitimate interests of the employer; and (4) the restrictions imposed are reasonably

limited in duration and geographic extent.  Hess v. Gebhard & Co., 570 Pa. 148, 157, 808 A.2d 912,

917 (2002); Thermo-Guard, Inc. v. Cochran, 408 Pa. Super. 54, 64-66, 596 A.2d 188, 193-94 (1991).

The party challenging the validity of the agreement bears the burden of proving that the terms of the

non-compete and other restrictions are not supported by consideration and/or are unreasonable.  John

G. Bryant Co. v. Sling Testing & Repair, Inc., 369 A.2d 1164, 1169-70 (Pa. 1977).

57.     A restrictive covenant need not appear in an initial employment contract to be valid.

Modern Laundry & Dry Cleaning Co. v. Farrer, 536 A.2d 409, 411 (Pa. Super. Ct. 1988).  If a

restrictive covenant "is an auxiliary part of the taking of employment and not a later attempt to

---

[11]    There was no choice of law provision included in the Agreement.  Fisher is a
corporation organized in Virginia with a principal place of business in Maryland.  However,
Fisher argues that Pennsylvania law applies in this case.  Because the law of three states are each
substantively similar, there is no conflict to address, and Pennsylvania law may be applied here.
See, e.g., New River Media Group, Inc. v. Knighton, 429 S.E. 2d 25, 26 (Va. 1993) (under
Virginia law, restrictive covenant is valid and enforceable if the restraint is (1) no greater than is
necessary to protect the employer in a legitimate business interest; (2) not unduly harsh and
oppressive in curtailing the employee's efforts to earn a livelihood; and (3) reasonable from the
standpoint of public policy); Becker v. Bailey, 299 A.2d 835, 838 (Md. 1973) (under Maryland
law, a non-compete agreement is enforceable if the agreement is supported by adequate
consideration and is ancillary to the employment agreement, and is "confined within limits which
are no wider as to area and duration than are reasonably necessary for the protection of the
business of the employer and do not impose undue hardship on the employee or disregard the
interests of the public").

impose additional restrictions on an unsuspecting employee, a contract of employment containing

such a covenant is supported by valid consideration and is therefore enforceable." Id. (citing

Beneficial Finance Company of Lebanon v. Becker, 222 A.2d 873, 876 (Pa. 1966)).[12]

58.     Ms. Haas argues that all the terms of a valid contract of employment, absent a

restrictive covenant, between herself and McKesson had been determined prior to her first day of

employment.  Thus, she argues, absent some additional consideration, the presentation of the

Agreement on her first day of employment renders the Agreement invalid.  In support of this

contention, Ms. Haas cites to Kistler v. O'Brien, 347 A.2d 311, 315-16 (Pa. 1975).

59.     In Kistler, the court held that an employee who had discussed and resolved all aspects

of his future employment, including job duties, amount of pay and insurance benefits two weeks

prior to being physically present to work had entered into a binding oral contract, and that the

presentation of a restrictive covenant on the employee's first day of work was not adequately

supported by consideration.  Hoping to achieve a similar result, Ms. Haas argues that all of the terms

of her employment with McKesson were determined prior to her first day of work at McKesson, and

---

[12]  In Beneficial Finance Company of Lebanon v. Becker, 222 A.2d 873, 876 (Pa.
1966), an employee began work on October 8, 1953 but did not sign a restrictive covenant
agreement until October 10, 1953.  The contract was not fully executed by the company until
nine days later when it was submitted to the corporate office.  Id. After the employee left and
began working for a competitor, the company sued to enforce the terms of the covenant, and the
employee argued that the restrictive agreement was not enforceable because its execution was not
ancillary to the taking of employment.  Id.  The court disagreed, noting that "it would be a far too
narrow construction of 'ancillary' [to hold] . . . that a contract of employment was not auxiliary
to the taking of employment when the contract was prepared the day the employee commenced
work, signed by the employee two days later, and accepted by the out-of-state parent corporation
nine days after that."  Beneficial Finance Co., 222 A.2d at 876.  The court then concluded that
"as long as the restrictive covenants are an auxiliary part of the taking of regular employment,
and not an after-thought to impose additional restrictions on the unsuspecting employee, a
contract of employment containing such covenants is supported by valid consideration and is
therefore enforceable."  Id. (citations omitted).

that absent any additional consideration, the presentation and execution of the restrictive covenant on her first day of work at McKesson renders the Agreement unenforceable.

60.     Although the facts of this case initially appear to fall into line with <u>Kistler</u>, there are significant distinctions that ultimately lead the Court to conclude that the Agreement in this case was ancillary to Ms. Haas's employment with McKesson and that there is sufficient consideration to support it.  First, there was not an oral contract of employment prior to Ms. Haas beginning her employment at McKesson, but rather only an offer letter which delineated certain rudimentary terms of proposed employment.  The offer letter specifically stated that it merely confirmed employment and did not "contract or commit to continued employment." <u>Plaintiff's Ex. 40</u>.  Thus, there does not appear to have been a contract in place prior to Ms. Haas's arrival at McKesson inasmuch as at least one party, namely the employer, did not view the letter as an employment contract.

61.     Additionally, there is evidence on the record that it was the policy and procedure of McKesson at the time that Ms. Haas was hired to require all "exempt employees, new hires and then existing employees that were promoted" to execute a confidentiality agreement.  <u>S. Marsh, Apr. 10, 2006</u> at 119:17-18.  This testimony was corroborated by Donald Nolde, who testified that signing a restrictive covenant was a requirement in the McKesson sales organization at the time Ms. Haas was hired.  <u>D. Nolde, Apr. 10, 2006</u> at 52:20-23.

62.     There is additional evidence that at the time Ms. Haas was hired, it was the standard practice of McKesson's Human Resource Department to send a copy of the confidentiality agreement with a letter offering an individual employment, along with a chain of custody drug form and a list of acceptable identification for I-9 employment verification and, possibly, a benefits

summary form.[13]  S. Marsh, Apr. 10, 2006 at 121:13-16.  Although Ms. Haas testified that the offer

letter contained no enclosures other than those specifically mentioned in the letter, Ms. Haas also

made it clear that she had a habit of not paying close attention to formal documents, and, as an

example of her casual approach to formalities, in fact, that she had not read the Agreement before

signing it.  E. Haas, Apr. 19, 2006 at 100:1-4; 48:12-25; 49:1-2.  Based on this testimony, and the

Court's evaluation of the credibility of Ms. Haas, it is likely that Ms. Haas was, or at least should

have been, aware of the Agreement prior to her arrival at McKesson to actually become a McKesson

employee.

63.     Even if Ms. Haas did not receive a copy of the Agreement prior to her first day of

employment with McKesson, it is not unreasonable to conclude that the Agreement was executed

in conjunction with and as an auxiliary part of her employment at McKesson.  Ms. Haas testified that

at the time she signed the Agreement, she had not yet begun her work at McKesson and could have

chosen not to sign it, and that she was not yet on the McKesson payroll at the time the Agreement

was executed.  E. Haas, Apr. 19, 2006 at 157:23-25; 158:1-13.  Moreover, the prefatory paragraph

of the Agreement itself states that execution of the Agreement was in consideration for being paid

a salary and other benefits.  Plaintiff's Ex. 2.[14]  Under these circumstances, the Court concludes that

the Agreement was supported by adequate consideration.

64.     Ms. Haas next argues that even if the Court were to find the Agreement to be

---

[13]  Ms. Marsh testified that in Ms. Haas's case, the benefit summary form may have been omitted because McKesson needed to make special accommodations with respect to health insurance for Ms. Haas, who was an out of state employee for McKesson.  S. Marsh, Apr. 10, 2006 at 122:11-25; 123:123-25; 124:1-3.

[14]  Such an agreement was upheld in Beneficial Finance Co. of Lebanon v. Becker, 222 A.2d 873, 535 n.4 (Pa. 1966).

supported by adequate consideration, it must find that the Agreement is not enforceable by its own terms. Ms. Haas specifically argues that by imposing limitations "for the period of my employment and for one (1) year after the date of termination of my employment *by the Company* I will not accept any employment position . . . .," the Agreement only applies if McKesson (or its successor, Fisher) terminated Ms. Haas, and not if Ms. Haas resigned. Because restrictive covenant agreements are, by their nature, contracts of adhesion, Ms. Haas argues that the language of the Agreement must be construed against the drafting party – in this case, McKesson.

65.     Under Pennsylvania law, where the terms of a contract are clearly expressed, a court must interpret those terms from the language of the contract itself. Commonwealth v. Brozzetti, 684 A.2d 658, 663 (Pa. Commw. Ct. 1996). Parol or extrinsic evidence may be considered to determine the intent of the parties only where the language in the contract is found to be ambiguous. Id. In turn, the terms of a contract may be found to be ambiguous "if, and only if, it is reasonably or fairly susceptible to different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning." Id. A contract is not rendered ambiguous by the "mere fact that the parties do not agree upon the proper construction." Id.

66.     Although Ms. Haas asserts that the reference to her termination "by the Company" is unambiguous, upon closer inspection of the Agreement the Court disagrees. The provision in question reads "[f]or the period of my employment by the Company and for one (1) year after the date of termination of my employment by the Company I will not [engage in certain activities]." Plaintiff's Ex. 3. It is at least equally likely that the three words "by the Company" modifies the word "employment" which immediately precedes the phrase, instead of "termination" which appears

earlier in the clause.  Indeed, in the beginning of the provision "by the Company" clearly modifies "employment" and it is not unreasonable to read its repeated use to do the same.  The relevant paragraph concludes with the statement "I understand that this paragraph 3 will have no effect and will be rendered null and void if my employment with the Company is terminated due to a reduction in force."  While Ms. Haas argues that the phrase "by the Company" can only imply her involuntary termination, the Court concludes that in addition to the sentence construction analysis presented above, the phrase could also be read to denote *that* the Company would terminate Ms. Haas from its payroll, either upon her resignation or termination otherwise.  This interpretation takes on additional significance when the  text of the entire paragraph is considered, as the provision for lifting the obligations of the agreement in the event of a reduction in force reflects the parties' intent to allow for certain exceptions.  Thus, the phrase highlighted by Ms. Haas does lend itself to some ambiguity.

67.  Where there is an ambiguity in a contract, a proposed interpretation that would yield an inequitable, absurd or unusual result is to be avoided if at all possible.  Mowry v. McWherter, 74 A.2d 154, 157 (Pa. 1950).  If a contract contains ambiguous language, a court must examine the entire document to determine the intent of the parties, and although parties are not necessarily to be relieved of obligations resulting from a poorly worded contract, a court should not "allow for a rigid literalness to be used in creating an improvident contract for [a party] against their intent."  Id. at 157-58.  In this case, the evidence suggests that it is highly improbable that McKesson intended for its confidentiality agreement to apply only to employees who were terminated by McKesson and, in those cases, not as a result of a reduction in force.  Such an intended result would defy logic for a business that required all of its sales force to commit to keep its protected information confidential.  Moreover, restrictive covenants and confidentiality agreements are well recognized as devices used

to try to protect employers left in the lurch by employees who depart for greener pastures rather than as mechanisms for further complicating the business lives of employees who have been fired. Because the phrase does lend itself to some ambiguity, and because the result suggested by Ms. Haas would impose a "rigid literalness" against Fisher, the Court rejects her argument.

68.     Having concluded that the Agreement was sufficiently ancillary to Ms. Haas's employment, was supported by adequate consideration and can be properly read so as to apply here, the Court must next consider whether the restrictions imposed are reasonably necessary for the protection of legitimate business interests of Fisher and whether the limitations are reasonable in their geographic scope and duration.

69.     Customer goodwill and confidential business information have each been recognized as legitimate business interests that may be afforded protection by a restrictive covenant. See, e.g., National Business Services, Inc. v. Wright, 2 F. Supp. 2d 701, 708 (E.D. Pa. 1998). Because Ms. Haas had extensive contact with Fisher's policies and procedures regarding pricing, the structure of its agreements and its proposal system, a restrictive covenant serves to protect a legitimate business interest.

70.     As for its temporal and geographic scope, the Agreement seeks to limit Ms. Haas's activity for a period of one year and does not include a geographic limitation. Plaintiff's Ex. 2. Pennsylvania courts have routinely upheld restrictive agreements with a comparable temporal scope. See, e.g., Wright, 2 F. Supp. 2d at 708 (citing cases). Moreover, Fisher is not seeking to impose any geographical restriction per se on Ms. Haas; rather, it seeks only to prevent her from soliciting business from her Fisher Contacts. Thus, the duration and geographic scope of the Agreement is not unreasonable. She is free to develop business anywhere and any time as long as she does not poach

24

Fisher business for one year.

71.     Because the Agreement meets all four prongs of the assessment required by Pennsylvania law, the Court finds that the Agreement is enforceable.  However, the broadly drawn definition of "Customer" in the Agreement warrants further consideration and requires some limitation in light of its breadth.

72.     The Agreement defines "Customer" to include "clients, customers and potential customers."  There are two practical problems with the enforceability of the Agreement as to "Customers" under this definition.  First, the Agreement does not otherwise define the difference between a "client" and a "customer," and, therefore, this use of language appears to be redundant. The second difficulty with the breadth of this definition is the use of the term "potential customer." This term, without additional explanation, is entirely too vague because, conceivably, it could encompass a universe of companies that would be unreasonably broad.

73.     At the hearing, the various references appeared to be interchangeable and, in virtually all cases, referred to a party for whom Fisher had completed some work or that had been working with Fisher.  Compare E. Haas, Apr. 19, 2006 at 17:14-15 ("I have gone on sales calls for current clients that are already Bilcare clients") with E. Haas, Apr. 19, 2006 at 26:8-9 (noting that OSI, which was a company on the Contact List, is a "customer or potential customer" for Bilcare). Therefore, the Court considers them to be referring to the same thing, namely, persons or entities who retain Fisher to supply some good or service for which payment is to be made.  Thus, the Agreement is enforceable with respect to customers for whom Fisher is currently doing work or for whom Fisher has completed work within the year prior to Ms. Haas's departure from Fisher – that is, from January 16, 2005.

74.     With respect to the breadth of the troublesome term "potential customers," the Court notes that at the hearing, Mr. Nolde testified that the sales cycle for Fisher's services ranges from six months to one year.  D. Nolde, Apr. 10, 2006 at 66:10-14.  Given this guidance and the fact that it is reasonable to assume that a "potential customer" is one who is considering a Fisher proposal that is presently pending, the Court finds that a reasonable enforcement of the Agreement with respect to "potential customers" is any customer for whom Fisher had an outstanding proposal as of January 16, 2006.

### Likelihood of Success on the Merits

75.     The Court must next determine whether Fisher is likely to succeed on the merits of its claims.  Fisher has included nine counts in its complaint, including (1) breach of the covenant against employment by a competitor against Ms. Haas; (2) breach of the covenant against solicitation against Ms. Haas; (3) breach of the Pennsylvania Uniform Trade Secrets Act against Bilcare and Ms. Haas; (4) breach of the duty of loyalty against Ms. Haas; (5) tortious interference with business relations against Bilcare and Ms. Haas; (6) tortious interference with contract against Bilcare; (7) aiding and abetting breach of fiduciary duty of loyalty against Bilcare; (8) unfair competition against Bilcare and Ms. Haas; and (9) unjust enrichment against Bilcare and Ms. Haas.  Each will be discussed in turn.

### A.     Breach of Covenant Against Employment

76.     In a Memorandum filed in support of the Motion for a Preliminary Injunction, Fisher conceded that it would not pursue enforcement of Paragraph 3(i) of the Agreement, which would have precluded Ms. Haas from accepting a position which would "require" use or disclosure of Company information.  Plaintiff's Memorandum of Law in Support of Preliminary Injunction at 7;

<u>Plaintiff's Proposed Findings of Fact and Conclusions of Law</u> at 6, n.2.   Because Fisher has

withdrawn this claim, its viability need not be considered here.

   **B.      Breach of Covenant Against Solicitation**

   77.    In Paragraph 3(ii) of the Agreement, Ms. Haas agreed that for one year after the

date of her employment with Fisher, she would not directly or indirectly solicit, encourage or induce

any employee of the Company to leave the employ of the Company.   <u>Agreement</u> at ¶ 3.   In turn,

Paragraph 3(iii) provides that Ms. Haas would not, for one year after leaving Fisher, "solicit the

business of any customers of the Company (other than on behalf of the Company)."   <u>Id</u>.   The

evidence presented leads to the conclusion that Fisher will more likely than not succeed in

establishing that Ms. Haas solicited the business of Fisher customers, in violation of Paragraph 3(iii)

of the Agreement.

   78.    At the hearing on this matter, it was demonstrated that Mr. O'Donnell, Ms. Haas's

supervisor at Bilcare, considered Ms. Haas to serve Bilcare as a "senior sales representative, not

necessarily with in-line management responsibilities."   <u>Plaintiff's Ex. 19</u> at 53D0064.   Although

when she testified, Ms. Haas disavowed having any sales responsibilities at Bilcare, she conceded

Mr. O'Donnell's description of her position as being a "sales" position, stating that "sales, to me,

I guess sort of breaks down into two parts."   <u>E. Haas, Apr. 19, 2006</u> at 16:15.   Ms. Haas further

asserted that it is not her job at Bilcare to obtain sales leads, but rather that her role is more

"supportive" of the sales team.   <u>E. Haas, Apr. 19, 2006</u> at 16:16-24.

   79.    Ms. Haas's assertions, however, do not square with the additional evidence presented

respecting her role at Bilcare. For example, on her first day of work at Bilcare, Ms. Haas received

in an electronic mail message from Mr. O'Donnell a listing of her top priorities at Bilcare, which

included "[i]dentifying new business" and "creating a customer database of key targets/contacts." Plaintiff's Ex. 55.  There was additional evidence presented that Ms. Haas complied with Mr. O'Donnell's request by contacting people she had done business with at Fisher, letting them know that she was now working at Bilcare and offering Bilcare's services.  See E. Haas, Apr. 19, 2006 at 161-162 (stating that after arriving at Bilcare, Ms. Haas had contacted, either by electronic mail, telephone or in person, OSI, ISTA, Millenium, and Praecis, each of whom were then Fisher clients).

80.    Ms. Haas argues that to the extent the Agreement is enforceable, the non-solicitation covenant must be narrowly construed to impose a restriction only upon direct sales by Ms. Haas to Fisher clients.  In support of this argument, Ms. Haas notes that while the non-solicitation of Fisher employees specifically states that Ms. Haas will not "directly or indirectly solicit, encourage or induce any employee of the Company" to quit working for Fisher, the absence of the words "directly or indirectly" in the non-solicitation of customers provision suggests that only direct solicitation should be forbidden.  In turn, because Ms. Haas asserts that her present position at Bilcare does not involve her in direct sales, she has not breached the provision.

81.    The Court finds that in the context of this case Ms. Haas places unwarranted emphasis on what amounts to a superfluous phrase "direct or indirect."  Read without those words, the simple prohibition on solicitation is as broad in its scope as it would be if the words were used.

82.    There is sufficient evidence on the record that Fisher is likely to succeed in its claim against Ms. Haas with respect to solicitation of business from its clients in violation of the Agreement.  It is clear from the evidence presented that Ms. Haas participated in attempting to bring new clients to Bilcare, and that some of those clients were customers of Fisher.  On February 1, 2006, after Ms. Haas had been working for Bilcare for only two weeks, Mr. O'Donnell sent an

electronic mail message specifically requested that all sales quotes that were going out directly to Ms. Haas's customer contacts be reviewed by her first.  Plaintiff's Ex. 56.  This evidence, in conjunction with the contacts Ms. Haas initiated to former clients, leads the Court to conclude that Fisher is likely to succeed on the merits of its claim that Ms. Haas breached her covenant not to solicit from Fisher's clients.  See also Plaintiff's Exs. 60, 51 (electronic mail messages seeking business from contacts).

**C.      Breach of Pennsylvania Uniform Trade Secrets Act by Bilcare and Ms. Haas**

83.      The Pennsylvania Uniform Trade Secrets Act provides that actual or threatened misappropriation of a trade secret may be enjoined.  12 Pa. C.S. § 5303.  A "trade secret" is defined as

> Information, including a formula, drawing, pattern, compilation, *including a customer list*, program, device, method, technique or process that (1) derives independent economic value, actual or potential, *from not being generally known to*, and not being readily ascertainable by proper means by, *other persons who can obtain economic value* from its disclosure or (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

12 Pa. C.S. § 5302. (emphasis added).  Misappropriation of a trade secret includes the "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use or derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use." 12 Pa. C.S. § 5302.  The burden of establishing the existence of a trade secret lies with the plaintiff.  Christopher M's Hand Poured Fudge, Inc. v. Hennon, 699 A.2d 1272, 1275 (Pa. Super. Ct. 1997).

84.     If a court finds that a misappropriation was willful and malicious, reasonable attorney fees, expenses and costs may be awarded.  12 Pa. C.S. § 5305.  Such behavior is delineated as "intentional acts or gross neglect of duty as to evince a reckless indifference of the rights of others on the part of the wrongdoer, and an entire want of care so as to raise the presumption that the person at fault is conscious of the consequences of his carelessness."  12 Pa. C.S. § 5302.

85.     Fisher contends that it is entitled to injunctive relief under the Pennsylvania Uniform Trade Secrets Act ("PUTSA") because Ms. Haas and Bilcare have misappropriated one or more of Fisher's trade secrets.  Plaintiff's Reply Memorandum at 7;  Complaint at ¶ 55.

86.     Ms. Haas's knowledge with respect to Fisher's pricing mechanisms is a trade secret protected by the PUTSA.  There is evidence that Ms. Haas obtained information while working at Fisher that would constitute a trade secret, such as the manner and method by which Fisher prices its services.  D. Nolde, Apr. 10. 2006 at 57:14-15; 64:23-25; 65:1-3.  With respect to this material, Fisher is likely to succeed on the merits of its claim.

87.     However, the information in Ms. Haas's contact list,[15] calendars and "scribble books" is not, with certain very limited exception, a trade secret under PUTSA.   Here, the Court draws a distinction between a "customer list," which would be protected under PUTSA and a list of personal contacts.

88.     The Court acknowledges that  the line between a valuable customer list and a personal contact list that is of little value to an employer is a fine one to make.  However, the distinction is one that is guided by the definition provided under PUTSA, which requires that a

_____

[15]  The Court notes that Ms. Haas's "Contact List" was encompassed in Plaintiff's Exhibits 4, 7-A and 7-B, which, according to Ms. Haas, were the same contacts presented in different formats.  E. Haas, Apr. 19, 2006 at 105:16-25; 106:1-8.

customer list have some economic value or that the efforts to maintain the secrecy of the list to be reasonable.  12 Pa. C.S.A. § 5302.

89.     Having reviewed the contact list, calendar and "scribble book" provided in evidence during the hearing, the Court concludes that aside from some limited information which will be herein outlined, this information does not constitute a "customer list" from which actual or potential economic value arises.

90.     First, the "Contact List" consists of a list of persons Ms. Haas personally compiled, including both personal and professional contacts, some of which are unquestionably stated to be customers of Fisher.  However, the bulk of this information could be obtained by other legal methods, such as from attendee lists from trade shows or even contacting the companies and seeking out specific departments.[16]  The only protected information that may be reflected in the contact list are those in which Ms. Haas has included specific information about a contact that would not be publicly available (i.e., entries containing private cellular telephone numbers or information with respect to the names of relatives or other personal information).  This information can easily be redacted from the list.

91.     Likewise, most of the information contained in the calendars and  "scribble books" either duplicate information contained in the Contact List or contains information so incomplete that it would be difficult for anyone at Bilcare, including Ms. Haas, to utilize the handwritten notes to Fisher's detriment.

---

[16]  In this regard, the Court notes that the job title for a number of the entries in the Contact list include "clinical supplies" or "clinical research" in the title and are obviously from departments that a potential Fisher salesperson could easily retrieve or obtain.  See, e.g., Plaintiff's Ex. 4 at 53D0162, 52D0167.1; 53D0167.3.

92.     Although most detail from the handwritten calendar notes and "scribble books,"  in

general, is either too disjointed or contains only partial or study specific information that would not

lend a competitive advantage to Bilcare, the following pages are found to contain pertinent

"Company information": 53D0069; 53D0079;53D0113; 53D0129; 53D0131; 53D0134;  53D0135;

53D0136.

93.     The Court concludes that Fisher has met its burden of proving that it is more

likely than not that it would succeed in establishing that Ms. Haas has taken some, albeit limited,

trade secret information with her to her new position at Bilcare.  However, there was not sufficient

evidence presented that Bilcare participated in obtaining confidential information from Fisher, and

Fisher has therefore not established that it is likely to succeed on the merits of its claim against

Bilcare.

94.     Finally, the evidence suggests that Ms. Haas knowingly took the information, some

of which was confidential information of Fisher, with the intent of using the information on behalf

of Bilcare.  The electronic mail messages that Ms. Haas sent to her former Fisher customers shortly

after arriving at Bilcare support such a finding.  Because this behavior was clearly willful, and

because Ms. Haas exhibited an "intentional negligence" with respect to using the contacts, the Court

also finds that Ms. Haas's conduct rises to the level of willful and wanton conduct as delineated in

the statute.

D.     **Breach of Duty of Loyalty by Ms. Haas/Aiding and Abetting by Bilcare**

95.     Fisher next argues that an injunction is appropriate because Ms. Haas has breached

her duty of loyalty to Fisher and that, by assisting her in doing so, Bilcare has aided and abetted such

a breach.  Fisher specifically argues that "[b]y diverting to Bilcare, while she was still a Fisher

32

employee, a valuable business opportunity or business opportunities, which she failed to disclose to Fisher, [Ms.] Haas breached her fiduciary duty of loyalty to Fisher and, instead, misappropriated and exploited for her own benefit, and the benefit of Bilcare, a business opportunity or opportunities presented to her by the position of trust and confidence that she had been given by Fisher." Complaint at ¶ 59.

96.     There was no evidence presented at the hearing with respect to potential business opportunities that Ms. Haas diverted from Fisher to Bilcare while she remained a Fisher employee. Therefore, Fisher has not established that it is likely to succeed on the merits of these two claims.

        F.      **Tortious Interference with Business Relations by Ms. Haas and Bilcare**[17]

97.     Fisher next contends that by retaining its trade secret information, Ms. Haas and Bilcare have tortiously interfered with its business relations with its customers and potential customers. Fisher specifically asserts that the conduct of Bilcare and Ms. Haas constitutes tortious interference with its business relations "inasmuch as [Fisher] has been deprived of a valuable business opportunity and the profits associated therewith." Complaint at ¶ 63. Fisher further asserts that it "will continue to be injured in that it will continue to lose customers, business, reputation and/or goodwill." Id. Based on these allegations, the Court discerns that Fisher asserts a claim for intentional interference with prospective business relations.[18]

_____

[17]  The Court notes that, typically, claims for tortious interference with either business relations or contract are remedied by monetary, and not equitable, damages. See RESTATEMENT (SECOND) OF TORTS at § 766. However, under certain circumstances equitable relief may be granted with respect to these torts. See RESTATEMENT (SECOND) OF TORTS at § 766, note u. For purposes of this Motion, the Court will consider whether Fisher presented sufficient substantive evidence to support such a claim.

[18]  This assessment is supported by the fact that in the next count of the Complaint, Fisher asserts that Bilcare has intentionally interfered with Fisher's contract with Ms. Haas.

98.    To establish the tort of interference with prospective business relations, Pennsylvania law requires that a plaintiff establish (1) a prospective contractual relation; (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of *actual damages* resulting from the defendant's conduct.  Infosage, Inc. v. Mellon Ventures, L.P., ___ A.2d ___, 2006 WL 827327 (Pa. Super. Ct. Mar. 30, 2006) (emphasis added); see also RESTATEMENT (SECOND) OF TORTS at § 766B ("one who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (b) preventing the other from acquiring or continuing the prospective relation**")**.

99.    At this juncture of the litigation, Fisher has not presented any evidence that it has suffered actual financial or business reputation damages resulting from Ms. Haas's conduct.  For example, there is no evidence on the record that a customer chose Bilcare over Fisher or that Fisher lost actual business as a result of the alleged interference.  Thus, Fisher has not established that it is likely to succeed on the merits of this claim.

### G.    Tortious Interference with Contract by Bilcare

100.    Fisher next argues that "Bilcare solicited, encouraged, or induced [Ms.] Haas, while she was employed as Fisher's Regional Sales Manager, to divert to Bilcare business that Fisher could have performed and had a right to expect [Ms.] Haas to seek on Fisher's behalf, thus causing [Ms.] Haas to violate her agreement not to engage in any other employment or business activity directly related to the business of Fisher and not to engage in any other activities which conflict with [Ms.]

Haas's obligations to Fisher."  Complaint at ¶ 14.

101.   Under Pennsylvania law, a claim for tortious interference with a contract is defined as intentionally and improperly interfering with the performance of a contract between another and a third person "by inducing or otherwise causing the third person not to perform the contract." Daniel Adams Assocs., Inc. v. Rimbach Publishing Co., 519 A.2d 997, 1000 (Pa. Super. Ct. 1987) (noting that the Pennsylvania Supreme Court has adopted the Restatement (Second) of Torts with respect to this claim).[19]  A person that is found to have tortiously interfered with a contract "is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract."  Id. (emphasis added).

102.   There is insufficient evidence to establish that Fisher is likely to succeed on the merits of this claim.  At the hearing, Ms. Haas testified that although she was asked, she did not disclose to Bilcare that she had signed a restrictive covenant with McKesson or Fisher.  E. Haas, Apr. 19, 2006 at 150:3-25; 151:1-22.  Mr. O'Donnell's testimony corroborates this assertion.  M. O'Donnell, Apr. 21, 2006 at 25:22-25; 26:1-18.  Mr. O'Donnell also testified that prior to the hearing regarding this motion, he did not have any knowledge of who Ms. Haas's personal customers were when she worked for Fisher.  M. O'Donnell, Apr. 21, 2006 at 22:22-25; 23:1-11.  While Fisher argues that several electronic mail messages which were entered into evidence illustrate that Mr.

---

[19]  With respect to this claim, Section 766A of the Restatement (Second) of Torts states that "one who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him."

O'Donnell encouraged Ms. Haas to utilize her contacts to bring business into Bilcare, the Court notes that each of these messages was sent prior to the date on which Fisher filed its complaint in this case, which was February 7, 2006.[20]   Thus, Fisher has not demonstrated that it is likely to succeed on the merits of this claim.

### H.   Unfair Competition by Bilcare and Ms. Haas

103.   Fisher next asserts that the behavior of both Bilcare and Ms. Haas constitute unfair competition that will cause Fisher to lose customers, business, reputation and/or goodwill. Complaint at ¶ 77.   Fisher does not address this claim in the Motion or any of its supporting submissions.

104.   Under Pennsylvania law, unfair competition is defined as "a common law cause of action which has been defined as the passing off by a defendant of his goods or services as those of plaintiff by virtue of substantial similarity between the two leading to confusion on the part of potential customers." Cottman Transmission Systems, Inc. v. Melody, 851 F. Supp. 660, 672 (E.D. Pa. 1994).

105.   There was no evidence presented at the hearing that Ms. Haas or Bilcare has marketed Bilcare products to Fisher customers in such a way that Fisher customers would become confused.   To the contrary, Mr. O'Donnell testified that the pricing systems between Fisher and

---

[20]   Fisher notes that Plaintiff's Exhibits 56, 75, 79 and 54 are the electronic mail messages to which Fisher refers. Each of these messages was sent before February 7, 2006.  See Plaintiff's Ex. 56 (sent on February 1, 2006); Plaintiff's Ex. 75 (sent on February 1, 2006); Plaintiff's Ex. 79 (sent on January 27, 2006); and Plaintiff's Ex. 54 (sent on February 6, 2006). Moreover, although one of these messages includes a reference by Ms. Haas that she wished to avoid being "in jail" – which could be interpreted that the author of the message had knowledge that contacting Fisher clients was wrong, given the temporal circumstances, this evidence is not sufficient to conclude that Bilcare intended to induce Ms. Haas to breach her contract with Fisher.

Bilcare was dissimilar, thereby suggesting that even if Ms. Haas did solicit business from Fisher customers, it is unlikely that Bilcare was presenting its services in the same manner that Fisher does. M. O'Donnell, Apr. 21, 2006 at 21:2-4.  Because of this lack of evidence, Fisher has not demonstrated that it is likely to succeed on the merits of this claim.

### I.    Unjust Enrichment by Bilcare and Ms. Haas

106.    Fisher finally argues that Bilcare and Ms. Haas have been unjustly enriched because while acting as a Regional Sales Manager for Fisher, Ms. Haas failed to attain a clinical trial of a drug called Dolobid as business for Fisher, but rather diverted this business to Bilcare, which improperly retained the benefits of the business.  Complaint at ¶¶ 80-83.

107.    At the hearing, Fisher presented no evidence with respect to this allegation in the Complaint.  Thus, it has not demonstrated that it is likely to succeed on the merits of this claim.

**Irreparable Harm to Fisher**

108.    Because the Court has concluded that Fisher has demonstrated that it is likely to prevail on some of its claims, the Court must next consider whether Fisher will be irreparably harmed if its request for a preliminary injunction is denied.

109.    To establish irreparable harm warranting the imposition of a preliminary injunction, a plaintiff must "demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial" and that "the preliminary injunction must be the *only way* of protecting the plaintiff from harm." Campbell Soup Co. v. Conagra, Inc., 977 F.2d 86, 91 (3d Cir. 1992) (emphasis in original).  The risk of irreparable harm is not enough; a plaintiff bears the burden of proving irreparable harm by "a clear showing of immediate irreparable injury." Id. (quoting ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir. 1987)).

110.     Within the Third Circuit, courts have found that injury to goodwill and the use of a company's confidential information are the types of injuries which would constitute irreparable harm that cannot be compensated with monetary damages.  See, e.g., National Business Services, Inc. v. Wright, 2 F. Supp. 2d 701, 709 (E.D. Pa. 1998) (injury to goodwill and use of confidential information constitute irreparable harm);[21] Hillard v. Medtronic, Inc., 910 F. Supp. 173 (M.D. Pa. 1995) (preserving customer relationships and goodwill is a protectable interest; restrictive covenants provide employer with "breathing spell" in which to regain customer goodwill after loss of employee).

111.     In this case, Ms. Haas had extensive exposure to Fisher's customers, its policies and procedures, as well as information about which customers were presently unhappy with specific Fisher services.  Although Ms. Haas and Bilcare each vigorously assert that in her present position at Bilcare Ms. Haas does not directly sell to customers, the evidence at the hearing suggests otherwise.  It is clear that even before she was ensconced at Bilcare Ms. Haas had contacted many

---

[21] Fisher relies on Wright to support its contention that it will be irreparably harmed if the preliminary injunction is not granted.  In Wright, the defendant was a person who entered into an agreement with her employer that included non-competition and non-disclosure covenants.  Wright, 2 F. Supp. 2d at 704.  The defendant worked at the plaintiff's company for three years, during which time she developed extensive customer relationships with the plaintiff's customers.  Id.  The defendant, who had been a sales person for the plaintiff, quit and took a position as Vice President of Internet Services with a company that was in direct competition with the plaintiff.  Id.

In finding that Wright's assumption of the new position would violate the agreement with the former employer plaintiff, the court found that the defendant would be marketing and developing products in direct competition with the products she had marketed for the plaintiff, and she would be selling to exactly the same customers that she dealt with while working for the plaintiff.  Id. at 708.  The court further found that the plaintiff would suffer "substantial injury" if the defendant were to work for the plaintiff's direct competitor and that "the potential injury to [the plaintiff's] goodwill and the potential use of [the plaintiff's] confidential information constitutes irreparable harm."  Id.

of her contacts, some of whom were customers of Fisher.  E. Haas, Apr. 19, 2006 at 161:17-25; 162:1-25; 163:1-7.  Moreover, the electronic mail messages that Ms. Haas began sending some of her contacts almost immediately upon arriving at Bilcare make it equally clear that Ms. Haas intended to sell Bilcare services.  See, e.g., Plaintiff's Exs. 51, 60, 83.  This solicitation is in direct violation of the Agreement, and, absent being ordered to stop, would irreparably harm Fisher because continued use of Fisher's confidential information would have the effect of eroding its customer goodwill.  Thus, Fisher has established the requisite irreparable harm.

**Balance of Harms**

112.   The Court must next consider whether the balance of harms favors Fisher or if, instead, granting a preliminary injunction would result in even greater harm to Ms. Haas and Bilcare.

113.   The Court concludes that Bilcare and Ms. Haas will suffer less harm if a preliminary injunction is granted than Fisher will suffer if such relief is not granted.  As noted above, Fisher is not pursuing that part of the Agreement which would require Ms. Haas to be removed from her position at Bilcare.  Rather, Fisher seeks only to enforce those parts of the Agreement that preclude Ms. Haas from using Fisher's confidential information and from soliciting business opportunities from Fisher's customers.  While the universe of "customers" as defined in the Agreement may have been quite broad, the Agreement has been found to be enforceable to a more narrowly defined set of customers.  These parameters limit any inconvenient harm suffered by Ms. Haas and will be sufficient to protect Fisher's interests.

114.   The Court must finally consider whether the public interest favors granting a preliminary injunction in this case.  There is an important public interest in enforcing contracts

39

voluntarily entered, particularly those entered by knowedgeable and experienced business persons. Merrill Lynch, Pierce, Fenner & Smith v. Napolitano, 86 F. Supp. 2d 491, 498-99 (E.D. Pa. 2000). Granting equitable relief such as a preliminary injunction may serve the public interest if it will "discourage . . . the wrongful use of confidential information and trade secrets and the disavowal of freely contracted obligations." Wright, 2 F. Supp. 2d at 709.

115.    Ms. Haas's contention that she never read the Agreement until after the filing of this lawsuit and that she had no knowledge that she had agreed to such restrictions is not credible. Even if true, it is not conduct that can or should be rewarded. Ms. Haas is an astute business person who negotiated sales of complicated studies with customers at McKesson and, in turn, Fisher. Just above the very space in which Ms. Haas hand-wrote her own name on the Agreement was the title, in large font, "Employee's Agreement Respecting Confidential Information, Competition and Trade Secrets." Plaintiff's Ex. 2; E. Haas, Apr. 19, 2006 at 156:19-25. The Court cannot conclude that Ms. Haas could have missed this language. Moreover, Ms. Haas had had conversations with Mr. Nolde while she was still working for Fisher about whether she would be permitted to "get out" of the Agreement. D. Nolde, Apr. 10, 2006 at 53:5-25; 54:1-4. Although Ms. Haas might wish that she had not signed the Agreement, her contention that she did not know it does not align with the other evidence presented. Because Ms. Haas knowingly entered into the Agreement, the public interest will be served in enforcing it.

## CONCLUSION

For the reasons discussed above, the Plaintiff's motion for preliminary injunction

will be granted, with limitations as stated in the following Order.


                                        S/Gene E.K. Pratter
                                        Gene E. K. Pratter
                                        United States District Judge


May 31, 2006

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **FISHER BIOSERVICES, INC.,** | : | **CIVIL ACTION** |
| **Plaintiffs** | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **BILCARE, INC. AND ELIZABETH** | : | |
| **J. HAAS,** | : | |
| **Defendants.** | : | No.   06-567 |

### O R D E R

**AND NOW,** this 31st day of May, 2006, upon consideration of the Motion for

Preliminary Injunction filed by the Plaintiff (Docket Nos. 3, 16) and after a hearing on the

Motion, it is **ORDERED** that the Motion is **GRANTED** in part as follows:

1.     Ms. Haas is enjoined until March 12, 2007[1] from soliciting business on behalf of

Bilcare from any current customers of Fisher or any customers with which Fisher had a proposal

outstanding as of January 13, 2006.  This restriction shall exclude PPD and Amylin, which were

already customers of Bilcare on or before October 20, 2005.  Soliciting business includes

communicating with and/or meeting with Fisher customers and also includes giving advice,

suggestions or other commentary to other Bilcare employees or representatives concerning such

customers, entities or persons.  Fisher shall provide to Defendants' counsel a list of the customers

subject to this Order, which list shall be used only to facilitate Defendants' compliance with this

Order and for no other purpose.

2.     Ms. Haas is directed to remove the following pages from her "scribble book,"

which are designated by the page number affixed to the Plaintiff's Exhibit 11: 53D0069;

---

[1] On April 10, 2006, after expressing concern over Defendants' repeated requests for
continuance of the hearing, the Court stated that "if ultimately there is a finding for the plaintiff
and . . . if there is an injunction that issues, it will be elongated or it will be in effect for an
additional period of time that would be the equivalent of the time period that has passed between
hearing dates." <u>Apr. 10, 2006</u> at 114:5-12.

53D0079;53D0113; 53D0129; 53D0131; 53D0134; 53D0135; 53D0136.  These pages should be returned to Fisher and no copies of them should be retained by Ms. Haas or anyone else outside of Fisher.

3.      Ms. Haas may retain her Contact List, but in cases where a contact is denoted as being a "client," all personal and information that is unique to an individual shall be redacted before the documents are returned to Ms. Haas.  Ms. Haas shall return any copies of her existing Contact List to Fisher, and shall delete any electronic copies of the list in her possession, whether on her own personal computer or on any computer owned or operated by Bilcare.

4.      Because Ms. Haas's conduct with respect to the misappropriate of confidential information of Fisher was found to be willful and malicious, the Court shall consider an award of reasonable attorney's fees, interest and costs to Fisher in an amount to be verified by counsel for Fisher as being incurred in order to pursue those claims on which Fisher has been successful.  A hearing on any such application for an award will be set following Fisher's motion for an award and after Defendants have had an opportunity to respond to such motion.

5.      Although no bond shall be required of Fisher as to Ms. Haas because the Agreement expressly dispenses with the necessity of a bond, Fisher shall post a bond, issued by a reputable bonding company, in the amount of $75,000 which shall be applicable to Fisher's claim for injunctive relief as to Bilcare.

6.      A status conference during which the Court will delineate a schedule with respect to the continued management of this case shall be held on June 19, 2006 at 2:00 p.m. in Chambers Room 5118, 601 Market Street, Philadelphia, Pennsylvania.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge